# STATE OF CONNECTICUT *v.*
# SALVATORE CARACOGLIA
# (AC 32699)

Gruendel, Beach and Flynn, Js.

test. See *Crawford* v. *Commissioner of Correction*, 294 Conn. 165, 191, 982 A.2d 620 (2009).

Argued October 25, 2011—officially released March 13, 2012

*Salvatore Caracoglia,* pro se, the appellant (defendant).

*Melissa L. Streeto,* assistant state's attorney, with whom, on the brief, were *Timothy J. Liston,* state's attorney, and *Jeffrey Doskos,* supervisory assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, J. The self-represented defendant, Salvatore Caracoglia, appeals from the judgment of conviction of two counts of the infraction of creating a public disturbance in violation of General Statutes § 53a-181a (a) (1) and (2), respectively. He was convicted after a court trial and has appealed on grounds that: (1) both subdivisions of the statute are facially vague, (2) the court improperly overruled the defendant's objection to an amendment to the information, (3) the court improperly overruled a defense "objection" to the state's failure to produce a tape recording of a 911 emergency telephone call made in connection with the incident that gave rise to the charges, (4) the defendant improperly was denied the right to a trial by jury, (5) the court denied the defendant's right to compulsory process to require the attendance of certain witnesses in his defense case and (6) the evidence did not suffice to establish the required mens rea for the commission of the infractions. We affirm the judgment of the trial court.

The record reveals the following procedural history and facts, which the trial court reasonably could have found. The Middletown Chamber of Commerce maintains a kiosk near 386 Main Street in Middletown where the public can post flyers and other paperwork to publicize job openings, activities and events taking place

throughout the town. Sometime between noon and 12:30 p.m. on October 24, 2009, the defendant was using a large hammer stapler to staple flyers onto the kiosk in such a manner as to cover and to obscure the other business and activity flyers already in place. By the time the defendant had covered at least two rows of flyers, Elizabeth Santangelo (Mrs. Santangelo), a member of the Chamber of Commerce, had exited 386 Main Street and began removing the defendant's flyers out of concern that they were obstructing the view of the flyers that were underneath. Mrs. Santangelo was not positioned near the defendant, and the defendant had his back toward her when she began removing the flyers. At no point during her subsequent interaction with the defendant did Mrs. Santangelo become physical or touch him.

The defendant confronted Mrs. Santangelo once he realized that she was removing his flyers. Mrs. Santangelo explained that the kiosk was maintained by the local Chamber of Commerce and that the defendant could not obstruct the other flyers. The defendant insisted that he had a right to post his flyers and yelled at Mrs. Santangelo in a loud manner. As Mrs. Santangelo continued her attempt to converse with the defendant, the defendant grabbed her shirt, which prompted her to yell: "Don't touch me." The defendant took a step toward Mrs. Santangelo and raised the hammer stapler over his head in a threatening manner.[1] Mrs. Santangelo stated, "go ahead hit me," to which the defendant responded, "I don't have to hit you," adding that he "could punch [her] and knock [her] down." Mrs. Santangelo felt threatened and terrorized.

---

[1] The trial court found that the defendant raised the hammer stapler over Mrs. Santangelo's head in a threatening manner. It is clear from her testimony, however, that the defendant raised the hammer stapler over *his* head in a threatening manner.

Officer Brian White of the Middletown police department was dispatched to the scene and arrived at approximately 12:30 p.m. Once Mrs. Santangelo was aware of the officer's presence, she recommenced the removal of the defendant's obstructive flyers from the kiosk. The defendant, acting in an angry and agitated state, as witnessed by Officer White, then approached Mrs. Santangelo and struck her on the right forearm. The defendant acknowledged that he made physical contact with Mrs. Santangelo, but claimed that he only "used [his] hand to move her hand" away from the flyers. The defendant also admitted to raising the hammer stapler over his head and acknowledged placing it into his vehicle prior to the arrival of the police. After a court trial, the court, *Vitale, J.*, rendered a judgment of conviction on July 28, 2010, of two counts of the infraction of creating a public disturbance in violation of § 53a-181a (a) (1) and (2), respectively. This appeal followed.

I

We first address the defendant's facial vagueness claim. There are two categories of impermissible vagueness of statutes. The first is facial vagueness in which no matter what the factual setting, the challenged legislative enactment is so lacking in standards and so amorphous as to give a person subject to it no real notice of what it proscribes so that conduct can be conformed to it. The second category is vagueness as applied to a particular factual situation. The defendant's claim is that § 53a-181a (a) (1) and (2), creating infractions of creating a public disturbance, are vague and that they impinged on his first amendment rights. We therefore analyze the claim as one of unconstitutional facial vagueness and reject his contention in reliance on our Supreme Court's decision in *State* v. *Indrisano*, 228 Conn. 795, 801, 804, 640 A.2d 986 (1994), in which the court determined in examining a similar claim made

in relation to a similar statute that the language of the statute was not facially vague.

"[A] penal statute [must] define [a] criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. . . . [This concept] embodies two central precepts: the right to fair warning of the effect of a governing statute or regulation and the guarantee against standardless law enforcement. . . . [T]he [most] important aspect of the vagueness doctrine is not actual notice . . . but . . . the requirement that a legislature establish minimal guidelines to govern law enforcement. . . . Thus, [i]n order to surmount a vagueness challenge, a statute [must] afford a person of ordinary intelligence a reasonable opportunity to know what is permitted or prohibited . . . and must not impermissibly [delegate] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. . . . Finally, [i]f the meaning of a statute can be fairly ascertained [the] statute will not be void for vagueness . . . for [i]n most English words and phrases there lurk uncertainties. . . . [T]he statute must contain some core meaning within which the defendant's actions clearly fall. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning. . . .

"For statutes that do not implicate the especially sensitive concerns embodied in the first amendment, we determine the constitutionality of a statute under attack for vagueness by considering its applicability to the particular facts at issue. . . . [T]o prevail on his claim, the defendant must demonstrate beyond a reasonable doubt that the statute, as applied to him,

deprived him of adequate notice of what conduct the statute proscribed or that he fell victim to arbitrary and discriminatory enforcement." (Internal quotation marks omitted.) *State* v. *Stephens*, 301 Conn. 791, 801–802, 22 A.3d 1262 (2011).

In the present case, the defendant claims that the creating a public disturbance infractions violated his first amendment right to free speech. We therefore review and analyze this appellate claim as challenging the constitutionality of the statute on its face, because the defendant claims that the statute is vague and ambiguous in that it lacks a core meaning. We examine the words of the statute and prior judicial gloss put on it to determine whether the statute gives proper notice of the conduct it proscribes so that it does not impinge on free speech rights guaranteed by the first amendment to the United States constitution. See *State* v. *Ryan*, 48 Conn. App. 148, 153–54, 709 A.2d 21, cert. denied, 244 Conn. 930, 711 A.2d 729, cert. denied, 525 U.S. 876, 119 S. Ct. 179, 142 L. Ed. 2d 146 (1998).

Our Supreme Court in *State* v. *Indrisano*, supra, 228 Conn. 809, adopted a judicial gloss on a similarly worded statute prohibiting the misdemeanor of disorderly conduct in violation of General Statutes § 53a-182. Like the statutory infractions of which the defendant was convicted, the disorderly conduct statute requires that the state prove that the defendant's predominant intent was to cause, what a reasonable person operating under contemporary community standards would consider, a disturbance to or impediment of a lawful activity, a deep feeling of vexation or provocation or a feeling of anxiety as to threatened danger or harm. Id., 810. The court stated that a defendant's "predominant intent must be to cause inconvenience, annoyance or alarm, rather than to exercise his constitutional

rights." Id., 809. It also defined inconvenience as representing "something that disturbs or impedes," annoyance as representing "vexation; a deep effect of provoking or disturbing," and finally alarm as "filled with anxiety as to threatening danger or harm." Id., 810. The court held that as to mens rea, the predominant intent must be "to cause what a reasonable person operating under contemporary community standards would consider a disturbance to or impediment of a lawful activity, a deep feeling of vexation or provocation, or a feeling of anxiety prompted by threatened danger or harm." Id.

The defendant acknowledges that the disorderly conduct language so construed by the court in *Indrisano* is identical to the language of the creating a public disturbance statute. Our Supreme Court's holding in *Indrisano*, therefore, governs this claim, and, by that gloss, the provisions of § 53a-181a (a) (1) and (2) are not facially vague.

## II

The defendant also claims that, on the day of the trial, June 23, 2010, the state improperly charged him in a substituted information with the infractions at issue in this appeal in lieu of the misdemeanor charges of disorderly conduct in violation of § 53a-182 (a) (1) and (2). The defendant claims that the substituted charges violated his sixth amendment right "to be informed of the nature and cause of the accusation" and his right to due process of law as protected by the fourteenth amendment to the United States constitution. We disagree.

Practice Book § 36-17 provides: "If the trial has not commenced, the prosecuting authority may amend the information, or add additional counts, or file a substitute information. Upon motion of the defendant, the judicial authority, in its discretion may strike the

amendment or added counts or substitute information, if the trial or the cause would be unduly delayed or the substantive rights of the defendant would be prejudiced."

"In determining whether the defendant's rights were prejudiced, this court considers the totality of the circumstances in deciding whether the defendant was surprised by the changes and whether the defense was hampered. . . . A bare assertion of prejudice is not sufficient to support a claim of prejudice. . . . The defendant must provide a specific showing of prejudice in order to establish that he was denied the right of due process of law . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Ryan*, 53 Conn. App. 606, 621, 733 A.2d 273 (1999).

The record indicates that the defendant initially was charged by the police with two counts of disorderly conduct in violation of § 53a-182. The court found that during a February 16, 2010 court proceeding, attended by the defendant and held almost five months before the start of trial, the state filed a substitute information, substituting for the misdemeanor charges of disorderly conduct originally charged, two counts of the *infraction* of creating a public disturbance. The state on June 23, 2010, the first day of trial, filed a long form information again charging two counts of the infraction of creating a public disturbance. We therefore reject the defendant's claim that the state, on the day of trial, improperly substituted the initial disorderly conduct charges with charges of creating a public disturbance, because that premise is not grounded in fact.

III

We next address the defendant's claim that the state violated disclosure obligations when it failed to disclose to him exculpatory information contained in a tape

recording that once existed of a 911 emergency telephone call relayed to police authorities concerning the incident at issue. The defendant claims that the trial court committed error by failing to dismiss the charges against him as a result of the state's failure to disclose the exculpatory information contained on the tape. We disagree.

The following additional facts are necessary to our analysis. The 911 tape containing the alleged exculpatory information relating to the incident at the kiosk was preserved for only thirty days after the date that the infractions occurred on October 24, 2009. Thirty-two days after the incident, on November 25, 2009, the defendant filed a motion for discovery requesting the state to disclose "all the information" in its "systems of record" pursuant to Practice Book §§ 40-11, 40-12 and 40-13 relating to the charges against him. The state issued its response to the defendant's discovery request on December 15, 2009, and attached a copy of the police report, the misdemeanor summons and complaint, Mrs. Santangelo's statement and the defendant's criminal record. The state also disclosed that it was not in possession or aware of any exculpatory material at the time it issued the response. The defendant did not request specifically the 911 tape until January 19, 2010, almost three months after he had been arrested. In response, the state immediately made a request to the Middletown dispatch center for copies of the tape, but was informed that the tape had been reused and was no longer available.

The defendant never moved to dismiss the infraction charges against him on the ground that the state had not provided him with the tape recording. The defendant did interpose an objection and claimed the state was withholding exculpatory evidence.

We turn now to the law and standard of review governing the state's obligation to disclose exculpatory

evidence to criminal defendants. "The defendant has a right to the disclosure of exculpatory evidence under the due process clauses of both the United States constitution and the Connecticut constitution. *Brady* v. *Maryland*, 373 U.S. 83, 86, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *State* v. *Simms*, 201 Conn. 395, 405 & n.8, 518 A.2d 35 (1986)." (Internal quotation marks omitted.) *State* v. *Ouellette*, 295 Conn. 173, 185, 989 A.2d 1048 (2010). The *Brady* analysis also applies to alleged discovery violations involving, as in this case, infraction charges. See *State* v. *Anthony*, 24 Conn. App. 195, 196–97, 208, 588 A.2d 214, appeal dismissed, 218 Conn. 911, 591 A.2d 813, cert. denied, 502 U.S. 913, 112 S. Ct. 312, 116 L. Ed. 2d 254 (1991) (applying *Brady* analysis to alleged discovery violation in court trial for infractions of simple trespass and creating public disturbance). "In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material." (Internal quotation marks omitted.) *State* v. *Ouellette*, supra, 185. General Statutes § 54-86c has amplified the first prong of the *Brady* test in Connecticut by imposing a continuing duty on the state to disclose both all exculpatory information in its possession and exculpatory information of which it subsequently becomes aware, regardless of a request by the defendant. See *State* v. *Bryant*, 17 Conn. App. 525, 527, 554 A.2d 1105 (1989). "[T]he trial court's decision regarding . . . a *Brady* violation will be overturned only upon a finding of clear abuse of discretion." (Internal quotation marks omitted.) *State* v. *Sells*, 82 Conn. App. 332, 351, 844 A.2d 235, cert. denied, 270 Conn. 911, 853 A.2d 529 (2004).

In the present case, the court overruled the defendant's objection because the defendant had not requested the tape in a timely manner, and his late

request was made after the tape had been destroyed. We conclude that the court did not abuse its discretion in overruling the defendant's objection. The state was unaware of the existence of any exculpatory information when it disclosed the materials in its possession, and the tape was no longer available when the state contacted the Middletown dispatch center immediately after the defendant brought the tape request to the state's attention. Because the defendant delayed in making this request, the state no longer had access to the tape, which had been erased and reused. The state has no duty to disclose information that it does not have. *State* v. *Spigarolo*, 210 Conn. 359, 386, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989). Under these circumstances, the court properly exercised its discretion. We therefore reject this claim.[2]

## IV

We next turn to the defendant's claim that he was denied his right to a trial by jury. The maximum fine for the infractions for which he was charged is ninety dollars per count. See General Statutes §§ 53a-181a (b) and 51-164n (g). A jury trial is not accorded to one charged with an infraction where the maximum penalty for any such count is a fine not exceeding one hundred and ninety-nine dollars. See General Statutes § 54-82b (a).

The defendant is claiming that he, nonetheless, has a valid claim to a jury trial because the sixth amendment to the United States constitution grants such a right in "all criminal prosecutions." The defendant, however,

---

[2] The defendant also mentions on page twenty-two of his brief that the state failed to disclose a police report filed by Officer Jorge Yepes and a written report filed by Mrs. Santangelo on October 24, 2009. His brief provides little analysis with respect to his claims as to either document. Therefore, we decline to review his claims.

misinterprets our law; the infractions of which he was convicted are not "criminal prosecutions." Generally, certain categories of petty crimes or offenses are not subject to the sixth amendment jury trial provisions, and crimes carrying penalties of up to six months imprisonment do not require a jury trial if they, otherwise, qualify as petty offenses. *Duncan* v. *Louisiana*, 391 U.S. 145, 159, 88 S. Ct. 1444, 20 L. Ed. 2d. 491, reh. denied, 392 U.S. 947, 88 S. Ct. 2270, 20 L. Ed. 2d 1412 (1968).

The infractions for which the defendant was charged impose no penalty of imprisonment. General Statutes § 53a-24 (a) provides in relevant part: "The term 'offense' means any crime or violation which constitutes a breach of any law of this state. . . or local law or ordinance of a political subdivision of this state, for which a sentence to a term of imprisonment or to a fine, or both, may be imposed, except one that . . . is deemed to be an infraction. . . ." An infraction is not defined as a crime or criminal prosecution by the applicable General Statutes. Section 53a-24 (a) provides that "the term crime comprises felonies and misdemeanors." An infraction is neither. Section 53a-24 (a) further provides that every offense that is not a crime is a "violation." Section 53a-24 (a) specifically exempts "infraction" from the definition of offense, and, therefore, it could not constitute either an offense or what the statute defines as a violation. The defendant's sixth amendment claim fails because the infractions for which he was charged are not "criminal prosecutions" that the sixth amendment contemplates would carry with them a right to a jury trial.

V

We address next the defendant's claim that the court denied his sixth amendment right to compulsory process by not ordering the clerk of the court to issue

subpoenas requiring the presence of certain witnesses in his defense case.

The following additional facts are pertinent. On June 23, 2010, the first day of trial, the defendant requested that he be given a brief continuance to secure witnesses. The court, however, noting that the defendant had been aware of his trial date since June 7, 2010, and that he had failed to take any steps to compel the attendance of these witnesses, requested that the defendant make an offer of proof as to what testimony he would elicit from them before granting a continuance. After the defendant's offer of proof, the court denied the request for a continuance. The defendant challenges the court's decision not to order the issuance of subpoenas with respect to two witnesses: Joe Imme and Councilman Robert Santangelo (Mr. Santangelo). We will address the court's ruling with respect to each witness in turn.

### A

On the first day of trial, the defendant sought a subpoena to call Imme to the witness stand to establish that Imme had "sent the Mafia after [the defendant]." We conclude that the defendant has not shown an abuse of discretion in the court's decision not to order the issuance of a subpoena for Imme.

"The federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The right to present a defense, and its concomitant right to compulsory process, are not unqualified. . . . To establish a violation of the right to present a defense based on lost evidence, a defendant must show that the evidence was material and exculpatory, and that it was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (Internal quotation marks omitted.) *State* v. *Tomas D.*, 296 Conn. 476, 497, 995 A.2d 583 (2010).

It is clear from reviewing the defendant's proffer that he sought to compel the attendance of Imme because of a personal conflict between him and Imme, which he wanted to address in court. The defendant's request to call Imme to testify about alleged threats that Imme had directed against the defendant was immaterial to the presentation of the defendant's defense against the charges of creating a public disturbance. "[T]he right to present a defense does not include the right to offer evidence that is incompetent, irrelevant, or otherwise inadmissible." (Internal quotation marks omitted.) *State v. McHolland*, 71 Conn. App. 99, 108 n.8, 800 A.2d 667 (2002). Consequently, the court did not violate the defendant's compulsory process rights by not ordering the issuance of a subpoena for Imme.

### B

As to the defendant's claim that the court should have issued a subpoena to compel the attendance of Mr. Santangelo, the defendant claims that another witness, Christopher Calabrese, lied on the witness stand when he testified that Mr. Santangelo was present at the scene of the incident between the defendant and Mrs. Santangelo and that Mr. Santangelo's testimony would call into question the veracity of Calabrese. Assuming without deciding that the court improperly abused its discretion in not allowing the defendant to call Mr. Santangelo as a witness, we conclude that any such error by the court was harmless. It is not enough to show evidentiary error; the defendant also must show harm. *Rokus* v. *Bridgeport*, 191 Conn. 62, 70, 463 A.2d 252 (1983).

The following additional facts inform our review. The defendant first requested that the court issue a subpoena for Mr. Santangelo so that the defendant could question him about whether he had threatened the defendant on November 6, 2009. The court denied the defendant's request because it was not relevant to the

altercation at the kiosk between Mrs. Santangelo and the defendant on October 24, 2009. The defendant responded that Mr. Santangelo's testimony would be relevant because Calabrese offered testimony earlier that Mr. Santangelo was present at the scene, which directly contradicted the defendant's recollection that he was not present. The court ultimately denied the defendant's request, finding that Calabrese's testimony never indicated that Mr. Santangelo was present at the altercation during the relevant time period, and that Mr. Santangelo's testimony, therefore, would be irrelevant.

Our review of Calabrese's testimony reveals that he was uncertain as to when, exactly, Mr. Santangelo arrived at the scene. Calabrese testified that Mr. Santangelo was inside the Democratic Party headquarters at the time the altercation started, that Mr. Santangelo did emerge at some point but that Calabrese was unsure as to the exact moment when he emerged.[3] "The testimony of any witness may be contradicted by the testimony of any other witness." (Internal quotation marks omitted.) *State* v. *Warren*, 14 Conn. App. 688, 699, 544 A.2d 209, cert. denied, 209 Conn. 805, 548 A.2d 442 (1988), cert. denied, 488 U.S. 1030, 109 S. Ct. 839, 102 L. Ed. 2d 971 (1989). The defendant wanted to examine Mr. Santangelo to ascertain whether he was ever present at the scene of the altercation to cast doubt as to the veracity of Calabrese's testimony. If Mr. Santangelo revealed that he, in fact, was never present at the scene at any point either during or after the altercation, then the veracity of the rest of Calabrese's testimony, including his assertion that the defendant had grabbed Mrs. Santangelo forcefully, would be called into question by

---

[3] The relevant excerpt from Calabrese's testimony reads as follows: "Mr. Santangelo eventually came outside at some point. I mean, it had to have been at least an hour between when the incident started and when . . . Officer White was done questioning everybody. At some point, Mrs. Santangelo's husband did come outside."

the fact finder. The prerogative of the fact finder to discredit the entire testimony of a witness if it determines that the witness intentionally has testified falsely in some respect is referred to by the Latin maxim falsus in uno, falsus in omnibus.[4] See *State* v. *Smith,* 201 Conn. 659, 666, 519 A.2d 26 (1986).

We conclude, however, that any error committed by the court in refusing to order the issuance of a subpoena for Mr. Santangelo was harmless. The defendant raises this error as a constitutional violation. The test of whether a constitutional violation is harmless depends on whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. *State* v. *Gerardi,* 237 Conn. 348, 362, 677 A.2d 937 (1996). Accordingly, "we review the record to determine whether there is a reasonable possibility that the evidence . . . complained of might have contributed to the conviction . . . ." (Internal quotation marks omitted.) Id. "[W]hen there is independent overwhelming evidence of guilt, a constitutional error would be rendered harmless beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Hoeplinger,* 206 Conn. 278, 295, 537 A.2d 1010 (1988).

Our review of the record reveals that there was sufficient independent eyewitness testimony from Officer White to convict the defendant of the charged infractions beyond a reasonable doubt. Officer White corroborated much of Mrs. Santangelo's testimony including his observation that the defendant struck her arm. At most, the proffered testimony from Mr. Santangelo only would have gone to the issue of Calabrese's credibility as a witness. Regardless of that determination, there remained sufficient evidence, through the testimony of Mrs. Santangelo and Officer White, to allow the fact

---

[4] Literally, false in one, false in all.

finder to convict the defendant of the charged infractions beyond a reasonable doubt.

C

We next discuss the defendant's attempt to recall Mrs. Santangelo. After this request was made, the court ordered the defendant to make an offer of proof about what additional material evidence he sought to obtain from his reexamination of her.

"The trial court has broad discretion in determining whether to permit a witness to be recalled. . . . In determining whether the trial court abused its discretion, every reasonable presumption should be given in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *State* v. *Wegman*, 70 Conn. App. 171, 186–87, 798 A.2d 454, cert. denied, 261 Conn. 918, 806 A.2d 1058 (2002). "Reversal is required only where an injustice appears to have occurred. . . . To establish an abuse of discretion, it must be shown that restrictions imposed on . . . [examination] were clearly prejudicial." (Internal quotation marks omitted.) *State* v. *Oliphant*, 115 Conn. App. 542, 550, 973 A.2d 147, cert. denied, 293 Conn. 912, 978 A.2d 1113 (2009). It is a cardinal rule of the law of evidence that cross-examination is limited to the scope of the direct examination. *State* v. *Ouellette*, 190 Conn. 84, 102, 459 A.2d 1005 (1983). We do not agree with the breadth of the trial court's statement that cross-examination would always suffice for a defendant to present evidence on his own behalf because the scope of the state's direct examination inherently limits the scope of the defendant's cross-examination. It occasionally may be necessary for the defendant to go beyond the scope of direct examination to present information material to his defense. To do so he may need to recall a witness. A trial court's discretion, therefore, is not unbridled if a defendant can show the need to go beyond the scope

of the direct examination to present evidence material to his defense. The defendant's stated reason for recalling Mrs. Santangelo was to clarify areas where her previous testimony conflicted with that of other witnesses. The court observed that resolving conflicts of evidence was a duty reserved to the court, and it did not justify recalling Mrs. Santangelo so that the defendant could ask the same questions he already had posed to her on cross-examination. The court did not abuse its discretion in denying the defendant's request to recall Mrs. Santangelo when the defendant could not point to any new evidence to be adduced that was material to his defense.

VI

Finally, the defendant argues that his judgment of conviction should be vacated because there was insufficient evidence to sustain a finding of guilty. After first being charged by the police with disorderly conduct in violation of § 53a-182, on February 16, 2010, the defendant was then charged in a substituted short form information with two infractions of creating a public disturbance in violation of § 53a-181a. On the day the court trial commenced, June 23, 2010, the state again filed a substitute information, this time in long form, making the allegations of each count more particular in pertinent part, as follows: "as to the first count, that on October 24, 2009 at or near 386 Main Street . . . the defendant, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . engaged in fighting or in violent, tumultuous or threatening behavior in violation of [§] 53a-181a (a) (1) of the Connecticut General Statutes." In the second count, the state charged that "on the same day at the same place, the defendant, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . annoyed or interfered with another

person, namely: Elizabeth Santangelo, by offensive conduct in violation of [§] 53a-181a (a) (2) of the Connecticut General Statutes." .

In determining whether the evidence is sufficient to sustain a verdict, "the issue is whether a jury could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Giguere*, 184 Conn. 400, 402–403, 439 A.2d 1040 (1981). The evidence is given the consideration most favorable to sustaining the verdict and to establishing each element necessary to prove the charges. Id., 403. The same factual circumstances can support a jury finding of either intentionality or recklessness. Id., 403–404. The court found that the defendant was guilty of both infraction charges.

The defendant never moved the trial court to acquit him because of insufficient evidence nor did he seek dismissal of the charges for failure to make out a prima facie case. On appeal, the defendant essentially argues in his brief that there was insufficient evidence to support a conviction under either the breach of the peace statute; General Statutes § 53a-181; or the disorderly conduct statute; General Statutes § 53a-182; rather than addressing the infractions with which he was charged. He takes issue with the conflicting versions of events testified to at trial. Sufficiency of the evidence is distinct from the credibility of witnesses. "On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finding] of guilty." (Internal quotation marks omitted.) *State* v. *Cox*, 293 Conn. 234, 245, 977 A.2d 614 (2009).

After a careful review of the record, we conclude that there was ample and sufficient evidence and permissible inferences drawn therefrom to support the court's determination that the defendant possessed the required mental state to have violated § 53a-181a (a) (1) and (2) of which he was convicted.

For all of the above reasons, the judgment is affirmed.

In this opinion the other judges concurred.